# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00664-CV

### S. A. D. and B. M. P., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 23-0147-CPSC1, THE HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants S.A.D. (Father) and B.M.P. (Mother) appeal from the trial court's order terminating their parental rights to their son (Child), who was approximately fifteen months old at trial.[1]  Father contends the trial court erred by denying his motion for continuance under Section 263.401 of the Texas Family Code and terminating his parental rights under Texas Family Code subsections 161.001(b)(1)(D) and (E).  Mother challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights under subsections (N) and (O).  And both Father and Mother maintain that the evidence was legally insufficient to conclude termination of their rights was in Child's best interest.  *See* Tex. Fam. Code § 161.001(b)(2).  We will affirm the order.

---

[1]  We refer to appellants as Mother and Father and to their son as Child.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  We refer to the other family members involved in this case by aliases.  *See* Tex. R. App. P. 9.8(b)(2).

Child was born to Mother and Father in July 2023. Shortly after, the Texas Department of Family and Protective Services (the Department) received a referral for neglectful supervision after Child's meconium tested positive for THC. During the Department's investigation, Mother admitted to using marijuana three to five times a week during her pregnancy. Mother also tested positive for marijuana shortly after Child's birth, and the Department established a safety plan that required a housemate to supervise Mother's interactions with Child. After the Department's investigator observed Child in the home with "no concerns for him at that time," and after Mother tested negative on a drug screen about two weeks later, the safety plan was lifted, and the investigation was closed with a "reason to believe" finding for neglectful supervision of Child by Mother.

On September 17, 2023, the Department received another referral for neglectful supervision of Child by Mother and Father. During a traffic stop, Mother was arrested for possession of methamphetamine. Following her arrest for possession of a controlled substance, Mother remained incarcerated after her parole[3] was revoked.[4] Father had marijuana on him and admitted to smoking it earlier that day, though he denied smoking around Child. Father's drug

---

[2] The following summary is based on evidence presented during the bench trial on October 9, 2024.

[3] Mother testified the charge underlying her parole was from October 2019 or 2020 and related to methamphetamine as well.

[4] On October 11, 2023, the Department received another referral based on the same allegations of marijuana and methamphetamine use by Mother and Father following Mother's testimony at her parole revocation hearing.

test was positive for marijuana. The Department implemented a safety plan by which Father's sister-in-law, Aunt Patty, would supervise Father's contact with Child.

On November 20, 2023, the Department received a referral that Child was left with Kaitlynn, a friend of Mother's, who was "reportedly homeless" and "seen walking around an . . . HEB" with Child, who was then just under four months old. The report also alleged Kaitlynn had Down syndrome and was using methamphetamine. During its investigation, the Department discovered that Father had been arrested on November 17 during a traffic stop for possession of marijuana and remained incarcerated with an immigration hold.[5] Father maintained that he left Child with Aunt Patty, not Kaitlynn, and that he did not know how Child ended up with Kaitlynn. Aunt Patty agreed that she had been Child's babysitter, but she stated that she had not seen Child in two weeks, and Father did not leave Child with her when he went to jail.

Kaitlynn told the Department's investigator that she had been babysitting for Father before he was arrested. Though she had been staying at a short-term rental, she was then staying with friends in a house where several people were using methamphetamine. Kaitlynn admitted she had been arrested for possession of a controlled substance in January 2022 and aggravated assault in July 2023. Following its investigation, the Department sought emergency removal of Child and filed its petition to terminate both Mother's and Father's parental rights.

The Department created service plans for Mother and Father. Mother's service plan requirements included the following: "to maintain a home that is safe and stable"; "participate in parenting classes"; "complete individual counseling"; "complete a psychological assessment" and "an OSAR assessment through Bluebonnet"; "attend AA/NA meetings in order to help with her

---

[5] Father told the Department investigator that he has been living in Texas for over a decade but is originally from Nigeria.

3

sobriety"; "submit to random drug screens"; "refrain from engaging in criminal activity"; "participate in all court-ordered services and follow recommendations"; and "complete a domestic violence program and engage in Batterer's Intervention and Prevention Program."[6] Father's service plan requirements were identical, except he did not have to complete a domestic violence or batterer's intervention and prevention program.

Before the final termination hearing, Child was placed in three different homes. First, he was placed with Aunt Patty and her husband, Father's brother. However, after the Department conducted a home assessment, Aunt Patty reported that they were unable to commit to caring for Child due to their work schedules. Next, Child was placed with Great Aunt Florence, Father's aunt. However, after Child lived with Great Aunt Florence for several months, she determined that she could no longer care for him due to physical and financial constraints. The day before trial, Child was placed with a foster family, who expressed interest in adopting him if both parents' parental rights were terminated.

The final termination hearing proceeded before the trial court on October 9, 2024. Three witnesses testified: Timothy Thomas, the Department's investigator; Mother; and Jeanette Ochoa, the Department's caseworker. Thomas testified that the Department removed Child because both parents were incarcerated and based on "concerns for the child being exposed to drug use" and reports that Kaitlynn was homeless, unemployed, and "had no plans" for where she and Child would be in the "foreseeable future." He also noted Kaitlynn had no documentation allowing Child to stay with her.

---

[6] As to the last item, the Department's caseworker explained that Mother "has a history of anger issues," but that her anger was not "directed against" Father.

Thomas testified that the Department "exhaust[ed its] reasonable efforts" to place Child with a family member and believed it was in the best interest of Child to be placed with a foster family, as there were no remaining kinship-foster-care options. He acknowledged that Father said he left Child with Aunt Patty—not Kaitlynn—and agreed that the Department previously determined Aunt Patty to be "someone the Department was okay with the parents leaving the child with." Thomas also agreed that Father had not tested positive for methamphetamine—only marijuana—and that Father was "cooperative" with the Department, including by providing several names of potential kinship placements. When asked about Kaitlynn, Thomas testified that she "seem[ed] of normal mental functioning," and the Department determined she cared for Child from October 31 through November 20. And Thomas agreed that when the Department removed Child, neither Child nor Kaitlynn looked "dirty or unkempt."

Mother appeared by videoconference. She testified that she is incarcerated for violating a condition of her parole from a prior conviction "for methamphetamine" three or four years ago. Mother maintained that she possessed—but was not actively using—methamphetamine, pointing to her recent drug tests, which were all negative for methamphetamine. She also maintained that Father did not know she had the methamphetamine, nor did he know that she was using marijuana while pregnant with Child.

Mother admitted to using marijuana while pregnant. She reported that after Child's "meconium level came back with a slight hint of THC," the Department came to her house to do a "wellness checkup" but left Child in her custody after finding "no harm done." But she acknowledged that shortly after this investigation, she was arrested for possession of methamphetamine.

5

Mother characterized Kaitlynn as "a friend of one of [her] cousins," with whom she is "not very" familiar. She stated she was "not fully" aware of the circumstances that led Child to be in Kaitlynn's care and had not been able to discuss the issue with Father due to his incarceration. Although Mother reported having suggested her brother in Florida as a placement for Child, she understood that the Department investigated and exhausted all kinship options, including her brother. Mother agreed that it was not safe for Child to be with Kaitlynn because "she was surrounded by people who were doing drugs."

Mother also testified to the services that the Department requested she complete as part of her service plan. She confirmed she is "on [her] medications" for depression and anxiety; was approximately three weeks away from graduating from her parenting class; had enrolled in an anger management course; and has "been doing everything possible that they have to offer since [she has] been incarcerated." Nonetheless, Mother acknowledged that due to limitations of services at the prison, she has not been able to complete an OSAR screening, attend individual counseling sessions, or attend AA or NA meetings. But Mother noted that she understands all services she needs to complete and has maintained communication with the Department representative. And she testified that the prison does offer mental health services, such that she can talk to a psychiatrist when she needs assistance with her depression, anxiety, or medications. Mother also discussed topics that she learned in her parenting class, including child development stages, how to handle emotions, discipline, and anatomy.

Mother confirmed that at the time of trial, she had eleven more months until her release date in September 2025. While she stated that her preference was for the Department to care for Child until her release, she agreed that it is not in Child's best interest to "stay[] in the system long term," as she noted that she was "basically raised in the CPS system" and "aged out

of foster care." To that end, Mother agreed that "until [she's] released," the Department "needs to find a permanency" solution for Child. When asked if it was in Child's "best interest" for her rights to be terminated, Mother testified:

> [I]f given the chance to keep [my parental rights], I would love them. I feel as though I have – if given – if given the chance, I will complete my family plan. I'm so close to getting done with parenting. I'm so close to my anger management. I'm complying with my medications. I've been doing everything I'm supposed to do while I've been given the opportunity.

Mother said that if this proceeding could somehow "extend . . . for 11 months," she believes she can give Child "a permanent home"; however, she understands that the primary goal of the Department is "to have structure, permanent structure" for Child. And when asked about Child's current foster family expressing interest in adopting him if parental rights were terminated, she stated:

> Honestly my goal is for him -- would be for him to return to his father or a family member of his father's. But, honestly, I think that if they were open to keeping in contact with us, that . . . I would be more open to it, yes, sir.

Similarly, Mother agreed that "if no one is able to care for [Child] long term like he needs, [she would] prefer him not to be stuck in the foster care system unable to be adopted or anything" and that "it's a very positive thing" that Child's foster family has "offered to allow [her] to have some contact with" Child.

Jeanette Ochoa, the Department's caseworker, testified last. She acknowledged that she was not the first Department caseworker but stated that she was familiar with both parents and the history in this case based on review of all notes and documents in the records. Ochoa noted that she had "full discussions about the family plans of service" with both parents and

7

confirmed both parents understood their plans, as well as the consequences for not completing them, including that "their rights could be restricted or terminated."

Ochoa specifically discussed Mother's service plan requirements. Ochoa acknowledged that the facility where Mother is incarcerated does not have individual counseling services, nor does it have OSAR testing, so Mother "would have to be released" to complete this portion of her plan. Likewise, Ochoa noted that Mother could not drug test while incarcerated, and Ochoa was "not sure" whether the facility offered AA or NA meetings.

Ochoa agreed that Mother has "made an earnest effort to find services within th[e] unit" where she has been incarcerated but "has not been able to comply with the actual service plan that was presented to her" since she has been incarcerated throughout the entire case. Among Mother's earnest efforts, Ochoa acknowledged, was that Mother appeared to be continuing medications as prescribed, and she has not "picked up any new charges" while incarcerated. And Ochoa testified that she did not expect that Mother would have completed everything in her plan within a year while incarcerated, and she understood that Mother is about three weeks away from completing her parenting class.

However, Ochoa stated that Mother "cannot maintain a safe and stable home" "considering she's incarcerated." Ochoa confirmed that because Mother cannot complete all services while incarcerated, she must "wait until she gets out to continue some of those services," which Ochoa noted would take "possibly another year" after Mother's release date. Ochoa explained that Child would thus remain in the Department's care for "possibly up to 24 months," which she said she did not think would be "the best route" for Child.

Ochoa testified that Father told her he completed parenting classes but had not yet provided the Department with a certificate of completion. And Ochoa stated that Father reported

8

to her that the facility where he is incarcerated also has limited services, so he has not completed the individual counseling requirement or OSAR test, nor has he engaged in drug testing or attended AA or NA meetings.

Ochoa testified that the last time she spoke with Father, he did not know whether he would be deported or remain in the United States. She further stated that Father told her he does not know when he will be released, nor has he discussed plans regarding where he may live, work, or care for Child "if and when he's released" from the federal facility. Ochoa agreed that Father cannot "maintain a safe and stable home at this time because he continues to be on an ICE hold" in a federal facility with no indication of how long he will be there.

In sum, Ochoa testified neither parent was able to complete their service plan, nor had either parent had any contact with Child. Though Ochoa noted that Mother reported keeping in contact with Child's paternal grandfather and uncle, she testified that the fact that neither parent has had any contact with Child was "concerning for developing a bond with his parents." In Ochoa's view, the Department took "reasonable efforts" "to utilize family relatives" for the child's placement, but the relatives, including Aunt Patty and Great Aunt Florence, were not able to care for Child long-term. Ochoa noted that the Department followed up with Mother's brother in Florida but was told "he was incarcerated for drugs."

Ochoa testified that she placed Child with his foster family the day before trial, and he was "fine" with the foster family, who seemed "appropriate" for him. Ochoa noted that after Child's arrival, the foster family "sat down with him on [the] carpet in the living area that has child[ren's], his age toys. And just held him, and played with him, and immediately you saw the baby sitting in foster mom's lap, and comfortable, and start getting up, running around, laughing

and smiling." Ochoa called this an "improvement" in his "behavior" and agreed that it looked like the foster family was "starting the slow process of bonding."

Ochoa said that the foster family indicated they wished to adopt Child in the future if termination proceeds and expressed interest in maintaining communication with Great Aunt Florence beyond the Department's involvement. If Mother's and Father's parental rights were not terminated, Ochoa testified that would "impede[] [Child's] ability to become adopted or find permanent placement," and the Department's concern was with "having to move him from home to home repeatedly," especially since he has been in three homes in the past year.

Ochoa testified that she believed it is in Child's best interest for Mother's rights to be terminated so Child could have "a chance . . . for permanency, for [a] stable home, to be adopted, long-term care." Ochoa agreed that it concerned her that Mother has violated parole and worries that "future similar circumstances might arise" that would put Mother "out of the child's life again." As to Father, Ochoa also agreed that it was in Child's best interest for his rights to be terminated "[f]or the same reasons. Permanency. His future is unclear as well. Stability." Ochoa noted her concern with "how quickly" Father could return to the United States or have somebody care for Child if Father were deported. She stated that as Child's permanent managing conservator, the Department would diligently work to reach the goal of permanency and having Child adopted such that the Department was "in the best place to give this child a long-term safe and stable home."

At the conclusion of the bench trial, the trial court determined that termination of Mother's and Father's parental rights is in Child's best interest and terminated Mother's parental rights under subsections (N) and (O) and Father's parental rights under subsections (D) and (E). Both parents appeal.

## STANDARD OF REVIEW

"To terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). "Clear and convincing evidence 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting Tex. Fam. Code § 101.007). This "higher standard of proof" is required "[b]ecause the termination of parental rights implicates fundamental interests." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014).

An appellate court conducting a legal sufficiency review in a termination-of-parental-rights appeal considers all evidence in the light most favorable to the trial court's finding, as well as any undisputed contrary evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that it was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "Courts 'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In a factual sufficiency review in a termination-of-parental-rights appeal, the appellate court considers and weighs disputed evidence contrary to the trial court's findings against the evidence in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* However, appellate courts "provide due deference to the decisions of the factfinder

11

who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d at 503.

## DISCUSSION

On appeal, Father argues that the trial court abused its discretion by declining to grant a continuance. Both parents contend that there was legally or factually insufficient evidence to support each of the trial court's statutory ground findings under section 161.001. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O), (D), and (E). And both parents challenge the trial court's best-interest finding. *See id.* § 161.001(b)(2).

### A. The trial court did not err by declining to grant Father's request for continuance.

Father maintains that the trial court should have granted his motion for continuance and extension. *See id.* § 263.401(b) (allowing for extension of child protection case under "extraordinary circumstances"). Specifically, Father contends that Child's placement with Great Aunt Florence deteriorated "immediately prior to trial," and a "short continuance and extension" would have allowed Father to locate a short-term placement until he could be released from custody.

A trial court may retain a child protection suit on its docket for a period not to exceed 180 days if it finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *In re O.R.F.*, 417 S.W.3d 24, 42 (Tex. App.—Texarkana 2013, pet. denied) (quoting Tex. Fam. Code § 263.401(b)). We review a trial court's decision on a motion for continuance for an abuse of

discretion. *Id.* (citing *In re T.T.*, 39 S.W.3d 355, 361 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

However, unless the parties consent or under other circumstances not present here, a trial court cannot grant a motion for continuance that is not supported by affidavit. *See* Tex. R. Civ. P. 251. And if a motion for continuance is not made in writing and verified, we presume the trial court did not abuse its discretion in denying the motion. *In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Here, the record does not contain an affidavit supporting the written motion for continuance as Rule 251 requires.[7] Because Father did not comply with Rule 251, we cannot conclude the trial court abused its discretion in denying his motion for continuance. *Id.* (citing *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986)). We overrule Father's issue as to his request for a continuance.

### B. Sufficient evidence supports the termination of Mother's parental rights under section 161.001(b)(1)(N).

Mother contends that there was not sufficient evidence to terminate her parental rights under section 161.001(b)(1)(N), which concerns constructive abandonment. Subsection (N) permits the trial court to terminate parental rights if it finds by clear and convincing evidence that the parent has:

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and (i) the department has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained

---

[7] Nor does the record contain an unsworn declaration supporting the motion. *See* Tex. Civ. Prac. & Rem. Code § 132.001(a) (permitting use of unsworn declaration instead of affidavit except as statute provides otherwise).

significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

Tex. Fam. Code § 161.001(b)(1)(N); *see In re G.P.*, 503 S.W.3d 531, 533–34 (Tex. App.—Waco 2016, pet. denied) (listing factors indicative of "parent's willingness and ability to provide the child with a safe environment" in constructive-abandonment context). Here, the undisputed evidence was that Child had been in the temporary managing conservatorship of the Department for over six months, Mother had been incarcerated for the duration of the case, and Mother had not attempted any contact with Child during that time. Thus, only the last element—whether there is sufficient evidence that Mother demonstrated an inability to provide Child with a safe environment—is at issue here.

Mother argues that she left Child with Aunt Patty—someone the Department had previously approved as a caregiver—and was unaware that Kaitlynn had the child. In other words, Mother contends that she left Child with someone she understood to be a safe caregiver during her incarceration. Further, Mother maintains that she suggested her brother as a suitable caregiver, and Child had been removed from his kinship placement "very close to the trial date," which did not leave Mother much time to find a new placement with another relative. In sum, she contends that termination under (N) was error because she has not "demonstrated an inability to provide the child with a safe environment." *See* Tex. Fam. Code § 161.001(b)(1)(N)(iii).

But the trial court could have credited the evidence of Mother's past drug use, drug possession, parole violation, and imprisonment as relevant under this factor. *See J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00754-CV, 2018 WL 1076825, at *4 (Tex. App.—Austin Feb. 28, 2018, no pet.) (mem. op.) (finding evidence legally and factually sufficient to support constructive abandonment when jury heard evidence of appellant's drug use, criminal

14

activity, imprisonment, lack of participation in case, and failure to stay in contact with or provide assistance for child); *see also In re I.D.*, No. 05-21-00244-CV, 2021 WL 4236878, at *7 (Tex. App.—Dallas Sept. 17, 2021, pet. denied) (mem. op.) (considering children's age of eighteen months and needing "constant attention" as factor in whether father demonstrated ability to provide children with safe environment). Though Mother did suggest her brother as a proposed placement, the Department's caseworker, Ochoa, testified that he was determined to not be suitable because "he was incarcerated for drugs." *Cf. In re A.S.*, 261 S.W.3d 76, 90 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (finding Department failed to meet its burden to show appellant demonstrated inability to provide child with safe environment when no evidence established whether or why Department rejected appellant's sister as kinship placement); *see also In re D.S.A.*, 113 S.W.3d 567, 573–74 (Tex. App.—Amarillo 2003, no pet.) (noting that incarcerated parent is not relieved from providing child safe environment as she "may be able to work through surrogates, such as relatives, spouses, or friends, to fulfill that obligation" and may "pursue a significant relationship with the offspring through, at the very least, written correspondence").

Viewing the record under the applicable standard of review, the trial court could have formed a firm belief or conviction that Mother constructively abandoned Child such that the evidence was legally and factually sufficient to support termination on these grounds. *See* Tex. Fam. Code § 161.001(b)(1)(N); *In re J.F.C.*, 96 S.W.3d at 266. We overrule Mother's issue regarding the sufficiency of evidence to support the trial court's findings as to the predicate statutory ground (N). "Because termination of a parent's rights can stand on one statutory ground plus a best interest finding," we do not reach Mother's arguments as to subsection (O). *J.M.*, 2018 WL 1076825, at *3 (citing *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003)).

**C. Sufficient evidence supports the termination of Father's parental rights under section 161.001(b)(1)(D) and (E).**

Father challenges the legal and factual sufficiency of the evidence supporting the trial court's predicate findings under subsections (D) and (E)—that Father (i) knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, and (ii) engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging subsection (D) or (E) finding because of "due process concerns, coupled with the requirement for a meaningful appeal").

Subsections (D) and (E) both require proof of endangerment. *In re S.B.*, 597 S.W.3d 571, 583 (Tex. App.—Amarillo 2020, pet. denied). A parent's endangering conduct under subsections (D) and (E) "need not 'be directed at the child or [require] that the child actually suffers injury.'" *In re R.R.A.*, 687 S.W.3d 269, 227 (Tex. 2024) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Instead, endangerment encompasses a larger array of conduct that exposes a child to loss or injury or jeopardizes the child." *Id.* (cleaned up). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being—the focus on grounds (D) and (E)." *Id.* These risks "can be developed by circumstances arising from and surrounding a parent's behavior"; however, they "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id.* (quoting *Boyd*, 727 S.W.2d at 533).

Subsection (D) focuses on "the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E)." *In re S.B.*, 597 S.W.3d at 583 (citing *Doyle v. Texas Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied)). "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent." *Id.* Subsection (E) focuses on the parent's conduct evidenced by his actions or failure to act. *Id.* (citing *In re M.J.M.L.*, 31 S.W.3d 347, 350–51 (Tex. App.—San Antonio 2000, pet. denied)). Though the conduct does not need to be directed at the child, termination under subsection (E) requires more than a single act or omission. *Id.* at 583–84.

As to subsection (D), the evidence was undisputed that Child was living with Kaitlynn in a house where people were using methamphetamine. Inappropriate or illegal conduct by people who live in the child's home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at *4 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Father maintained that he left Child with Aunt Patty, not Kaitlynn; however, Ochoa testified that the Department determined that Child had been in Kaitlynn's care since October 31—over two weeks before Father was incarcerated. Our standard of review requires deference to the trial court's reasonable resolution of conflicting evidence. *F.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *1 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), and *In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014)); *see In re J.S.*, 584 S.W.3d 622, 637 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("[T]he trial court, as the factfinder, was the sole judge of the credibility of the witnesses, and the court was free to disregard Father's

17

self-serving testimony [regarding disputed drug use].").  Based on the evidence in the record, the trial court could have formed a reasonable belief that Father knowingly placed Child in conditions or surroundings which endangered Child's physical or emotional well-being by leaving Child in Kaitlynn's care.

As to subsection (E), there was evidence that Father had a history of illegal drug use.  For example, Father's service plan noted that he "has multiple possession of marijuana charges, possession of controlled substance charges, and a DWI all spanning from 2016 to 2023," with the most recent charges being a DWI in October 2023 and a possession-of-marijuana charge in November 2023.  Indeed, though Father was not arrested at the September 17 traffic stop that led to Mother's incarceration, he admitted to possessing and smoking marijuana earlier that day.  And even after Mother's incarceration, Father continued to use marijuana, which led to his arrest.

A parent's criminal history may be considered as an endangering course of conduct under subsection (E), as "routinely subjecting a child to the probability that the child will be left alone because his parent is in jail endangers the child's physical and emotional well-being." *F.C.*, 2020 WL 101998, at *10 (citing *In re J.S.*, 584 S.W.3d at 635).  Given the record, the trial court could have reasonably concluded that Father's continuing illegal drug use, including after Child was born and when he was the sole parental caretaker, supported the conclusion that he engaged in an endangering course of conduct under subsection (E).  *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).  That this same course of conduct subjected him to the threat of deportation only underscores the potential instability Child faced because of Father's actions.  *See J.O. v. Texas Dep't of Fam. & Protective Servs.*, 604 S.W.3d 182, 191 (Tex. App.—Austin 2020, no pet.) ("Deportation of a parent is relevant but insufficient 'in and of itself to establish endangerment[,]'" and "[i]ts 'relevance to

18

endangerment depends on the circumstances.'" (citing *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012))); *cf. In re E.N.C.*, 384 S.W.3d at 805 (finding no evidence that Father's criminal activity before children were born and that led to his deportation "created such uncertainty and instability for his children sufficient to establish endangerment" under subsection (E)).

Thus, the evidence is legally and factually sufficient to support the trial court's termination of Father's parental rights under subsections (D) and (E). Father's challenge to the statutory predicate findings for termination is overruled.

### D. Sufficient evidence supports the best-interest finding.

Finally, both parents challenge the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding. There is "a strong but rebuttable presumption that the best interest of the child is served by keeping him or her with their natural parents." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 525 (Tex. App.—Austin 2019, no pet.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). When reviewing the trial court's best-interest findings, courts consider factors including (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent-child relationship is improper, and (9) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see K.L. v. C.P.*, No. 03-22-00704-CV, 2023 WL 3853624, at *4 (Tex. App.—Austin June 7, 2023, no pet.) (mem. op.) (citing *M.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00163-CV, 2022 WL 4281617, at *7 (Tex.

App.—Austin Sept. 16, 2022, pet. denied) (mem. op.)); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). This list is not exhaustive, nor is one factor controlling. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See id.*

On this record, we conclude that the evidence is sufficient to support the trial court's determination that termination of both Mother's and Father's parental rights is in Child's best interest. The evidence presented to satisfy the predicate-ground findings—regarding constructive abandonment for Mother and endangerment for Father—is similarly probative that termination of both parents' rights is in Child's best interest. *See id.* Both parents are incarcerated—and have been for most of Child's life—for possessing and using illegal drugs. *See E.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00427-CV, 2018 WL 6056959, at *3 (Tex. App.—Austin Nov. 20, 2018, pet. denied) (mem. op.) ("A parent's current and future incarceration is relevant to his ability to meet the child's present and future physical and emotional needs, and the parent's incarceration at the time of trial makes his future uncertain." (internal quotation omitted)); *see also In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." (citation omitted)). Though Mother is scheduled for release in September 2025 and testified generally that she believed she could provide a permanent home for Child when she was released (without providing specific plans), the trial court could have found her testimony not credible and credited the evidence that she is incarcerated for possessing a controlled substance

20

and violating her parole conditions, which "raise[s] the possibility that [s]he will continue to engage in criminal activity and risk imprisonment in the future." *J.G.*, 592 S.W.3d at 525 (citing *In re J.S.*, 584 S.W.3d at 635).

Likewise, Father remains incarcerated and faces deportation; there was no evidence regarding his potential release date or whether he had any plans for where he would live or work or how he would care for Child upon his release. *See G. C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00501-CV, 2022 WL 17330864, at *6 (Tex. App.—Austin Nov. 30, 2022, no pet.) (mem. op.) (collecting cases discussing incarcerated parent's ability to meet child's emotional and physical needs); *see also D. M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00557-CV, 2021 WL 1418986, at *12 (Tex. App.—Austin Apr. 14, 2021, no pet.) (mem. op.) ("The trial court could also consider the emotional danger to [child] in continuing a relationship with a mother who would come in and out of her life because of drug use or incarceration, disrupting any permanency or stability for [child]." (quoting *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *8 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.))).

Further, "[a] factfinder may infer that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *4 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). Thus, the trial court could have concluded that both Mother's and Father's drug-related criminal activity, as well as Father's decision to leave Child with an unsafe caretaker, "may recur in the future" if Child were returned to either parent and would expose Child to emotional and physical danger. *See id.* The trial court could have similarly concluded that this conduct reflected poorly on the parents' parenting abilities and suggested that the existing

21

parent-child relationship was improper. *See id.* And neither parent has attempted to contact the Child, including by writing letters. *See D.M.*, 2021 WL 1418986, at *12 ("Father has little relationship with the child, in large part due to his own conduct, which resulted in his imprisonment for two years of the child's short life. . . . He had not taken advantage of the opportunity to have in person visits to try to build a closer relationship.").

On the other hand, Ochoa testified that she observed that Child appeared to be doing well with his foster family, who wants to adopt him and is open to maintaining contact with Child's family. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R.*, 2018 WL 1023899, at *3 (citing *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.)). While a factfinder cannot terminate a parent's rights "merely because the child might be better off living elsewhere, 'a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered.'" *Id.* (quoting *Robert T.*, 2013 WL 812116, at *12). The trial court could have properly considered the evidence of the Department's concern with "having to move [Child] from home to home repeatedly," especially since he has been in three homes in the past year. And while both Mother and Father advocated for Child to be placed with a family member, the trial court heard evidence that the proposed relative placements were untenable. *See J. M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 WL 7163637, at *14 (Tex. App.—Austin Oct. 13, 2022, no pet.) (mem. op.) (affirming trial court's best-interest finding despite father's argument that best interest of children would be served by placing them with relatives because evidence showed proposed relative placements were unsatisfactory).

22

The evidence showed that Mother and Father both attempted to comply with their service plans but were unable to do so given the limitations of the facilities where they are incarcerated. Even crediting those efforts, however, the trial court could have reasonably concluded that termination of both parents' rights is in Child's best interest, particularly given that "the paramount consideration in a best-interest determination" is the "child's need for permanence through the establishment of a stable, permanent home." *E.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *8 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (quoting *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)).

On this record, we conclude that there is sufficient evidence from which the trial court could have formed a firm belief or conviction that termination of Mother's and Father's parental rights is in Child's best interest. We overrule both parents' challenges to the trial court's best-interest finding.

## CONCLUSION

For the above reasons, we affirm the trial court's order of termination.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: February 21, 2025

23